TROY A. EID
United States Attorney
District of Colorado
1225 Seventeenth Street
Denver, CO 80202

RICKEY WATSON
MICHAEL G. PITMAN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 305-7938

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| Abraham J. Osman, & Dorothy K. Osman,<br><br>     Plaintiffs,<br><br>        v.<br><br>United States of America,<br><br>     Defendant. | Civil No.  06-cv-2318-MSK-MJW |

## DEFENDANT UNITED STATES OF AMERICA'S
## MOTION FOR SUMMARY JUDGMENT

Defendant the United States of America ("United States"), by and through its undersigned counsel, hereby moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an Order granting summary judgment in favor of the United States.

## BACKGROUND

Plaintiffs transferred all 500 shares of their business, the Schlosser Tool &
Machinery Company ("Schlosser"), to their son and daughter-in-law on December 31,
1992. Shlosser's value was determined in advance of the transfer by an appraising
company, Quist Valuation, Inc., which performed an analysis in October 1992 and
determined that Schlosser was worth $1,644,500. *See* Complaint filed on November 17,
2006, (Doc. # 1), at ¶ 8. Once the valuation was complete, Plaintiffs gave 364 shares of
Schlosser to their son and daughter-in-law, and sold the remaining 136 shares to them
for $447,304, which Plaintiffs' son and daughter-in-law agreed to pay-off, plus interest,
in 120 monthly payments. *See* Complaint at ¶¶ 9-10. Plaintiffs' son and daughter-in-
law made regular monthly payments which the Plaintiffs reported as income.

Unfortunately, once the transfer was complete and Plaintiffs' son and daughter-
in-law took over as the day-to-day operators of Schlosser, the business began to fail. By
the end of 1998, the business's ability to continue as a going concern was in doubt. *See*
transcript of Robert J. Osman's July 18, 2007 deposition, relevant excerpts of which are
attached as Exhibit A, at 32:15 – 32:24. Plaintiffs' son and daughter-in-law concluded
that the business's woes were caused by accounting problems that predated the 1992
transfer, and, in July 1999, Quist was hired to perform a retroactive valuation of
Schlosser in light of the newly discovered accounting problems. Quist concluded that
Schlosser had been overvalued by $333,000 at the time of the 1992 transfer. *See* April 18,
2000 Compromise Agreement, attached as Exhibit C, at ¶ 6.

Several months later, Plaintiffs and their son and daughter-in-law entered into a "Compromise Agreement" in which they agreed that: Schlosser had been overvalued by $335,804 in 1992; Plaintiffs' son and daughter-in-law had overpaid $46,351 worth of interest since 1992; the overvaluation was Plaintiffs' responsibility; and Plaintiffs should refund the alleged $382,155 overvaluation. *See* Exhibit C. Rather than paying their son and daughter-in-law cash, Plaintiffs: forgave the final two monthly payments, worth a total of $10,854; forgave $140,000 worth of loans to Schlosser; forgave $170,000 worth of loans to their son; and made two cash payments, worth a total of $61,301, to their son and daughter-in-law. *See id.* at page 2.

Once this transaction was complete, Plaintiffs filed a tax return seeking a refund for income tax they had previously paid on income associated with the sale of the business. *See* Complaint at ¶ 16. When their claim was denied by the Internal Revenue Service, Plaintiffs filed this suit seeking a refund of $65,421, plus interest. Plaintiffs allege that they are entitled to a refund under the "claim of right" doctrine, codified at 26 U.S.C. § 1341, for tax they paid on $382,155 worth of income they received from their son and daughter-in-law in the form of monthly payments.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

### A.   Defendant is Entitled to Summary Judgment on Claim 1: Refund Suit

1.   Burden of Proof and Elements

Because Plaintiffs seek a refund of taxes, they bear the burden of proving that the taxes assessed were incorrect, as well as the burden of proving the correct amount of tax owed. *See United States v. Janis*, 428 U.S. 433, 440 (1976); *Ebert v. United States*, 66 Fed. Cl.

287, 290 (2005); *In re Steffen*, 349 B.R. 734, 740-41 (M.D. Fla. 2006). Here, since Plaintiffs

rely on the "claim of right" doctrine, as an initial matter they must demonstrate that they

are entitled to favorable treatment under 26 U.S.C. § 1341. "The language of § 1341

requires [Plaintiffs] to prove that five factors have been met: (1) an '*item*' must have been

'*included in gross income* for a *prior* taxable year (or years),' (2) 'because it *appeared* that the

taxpayer had an unrestricted right to such item;' (3) a '*deduction*' must be 'allowable for

the taxable year,' (4) 'because *it was established* after the close of such prior taxable year (or

years) that the taxpayer did not have an unrestricted right to such item or to a portion of

such item;' and (5) 'the amount of such deduction' must exceed $3,000." *Pennzoil-Quaker

State Co. & Subsidiaries v. United States*, 62 Fed. Cl. 689, 693 (2004) (quoting 26 U.S.C. §

1341). Should Plaintiffs clear the initial burden of showing that they are entitled to

favorable treatment under Section 1341, they must then go on to prove (6) the correct

amount of tax owed. Plaintiffs cannot satisfy elements (3), (4), or (6).

### 2.   Elements that Cannot be Proven by Plaintiffs

Element 3:  Plaintiffs cannot demonstrate that a deduction is allowable.

Although courts often loosely refer to amounts "deductible" under Section 1341,

a taxpayer must actually look elsewhere in the Internal Revenue Code to establish that a

deduction is allowable – the taxpayer is only entitled to a credit under the claim of right

doctrine if the requested refund is justified by a section of the Code other than Section

1341. *See United States v. Skelly Oil Co.*, 394 U.S. 678, 683 (1969); *Pennzoil-Quaker State*, 62

Fed. Cl. at 699-700; *Florida Progress Corp. & Subsidiaries v. Comm'r*, 348 F.3d 954, 958-59

(11th Cir. 2003). The Complaint does not identify a separate section of the Code under

which their requested refund would be justified.  Accordingly, Plaintiffs' claims must fail because they have not even alleged that the requested refund is allowed by a separate section of the Code.

Element 4:  Plaintiffs cannot demonstrate that they did not have an unrestricted right to the income at issue.

In order to satisfy the requirements of Section 1341(a)(2), Plaintiffs must demonstrate, among other things, that they were legally obligated to return the funds at issue.  *Kappel v. United States*, 437 F.2d 1222, 1226 (3d Cir. 1971).  "Stated another way, 'the payee must have at least the ability to legally compel the repayments before the repayments can be deducted by the payor.'"  *Pennzoil-Quaker State*, 62 Fed. Cl. at 701 (quoting *Berger v. Comm'r*, 37 T.C. 1026, 1032 (1962)).  This element is necessary because "it is not given to a taxpayer to lift the federal tax-hand from income, which he has once received in absolute right, by an attempt thereafter to alter its legal status through modification of the agreement out of which it arose."  *Leicht v. Comm'r*, 137 F.2d 433, 435 (8th Cir. 1943).  Accordingly, voluntary repayments, and even repayments motivated by a subjective belief, are not sufficient.  *See Cinergy Corp. v. United States*, 55 Fed. Cl. 489, 507 (2003); *Cal-Farm Ins. Co. v. United States*, 647 F. Supp. 1083, 1092 (E.D. Cal. 1986) (citing cases).  Here, Plaintiffs cannot satisfy this element because they repaid the funds at issue voluntarily despite the fact that they were under no legal obligation to do so.

The only possible basis for Plaintiffs' argument that they were legally obligated to return the funds at issue is the Compromise Agreement.  While it is true that, under certain circumstances, good-faith, non-collusive settlement agreements entered into to

terminate litigation after arm's-length negotiation are sufficient to establish a legal obligation to repay under Section 1341(a)(2), the Compromise Agreement cannot.  As an initial matter, the Compromise Agreement was not entered into to terminate litigation because Plaintiffs' son and daughter-in-law never filed a lawsuit against Plaintiffs.  *See* Exhibit A at 66:16 – 66:18.  This fact alone is arguably sufficient to defeat Plaintiffs' claim.  *See Pennzoil-Quaker State*, 62 Fed. Cl. at 701 (where there is "no suit against the [taxpayer] for repayment of money, [it is] more likely that the taxpayer acted voluntarily in paying the money and less likely that the taxpayer can 'demonstrate at least the probably [sic] validity of the adverse claim.'") (quoting *Pike v. Comm'r*, 44 T.C. 787, 799 (1965)).

But more importantly, the very posture of the parties to the Compromise Agreement, when considered in conjunction with their relationship to each other, makes it abundantly clear that the Compromise Agreement cannot properly be interpreted as embodying Plaintiffs' actual legal obligations.  The parties to the Compromise Agreement were the Plaintiffs on the one hand, and their son and daughter-in-law on the other.  *See* Exhibit C.  The parties never entered into any sort of adversarial relationship.  *See* transcript of Abraham J. Osman's July 18, 2007 deposition, relevant excerpts of which are attached as Exhibit B, at 67:14 – 67:17; Exhibit A at 65:24 – 66:2.  In fact, there were literally no negotiations regarding how the Compromise Agreement" agreement would be structured.  *See* Exhibit B at 67:14 – 67:22; Exhibit A at 65:10 – 65:17.  Plaintiffs simply agreed to repay the entire alleged overvaluation without ever disputing their liability.  *See* Exhibit B at 67:23 – 68:3.  For their part, Plaintiffs' son

and daughter-in-law never considered filing a lawsuit against Plaintiffs. *See* Exhibit A at 66:19 – 66:23. Their relationship was perhaps best summarized by Plaintiffs' son when he said: "My dad and I have a great relationship. And I think normally my dad would come to the table and offer more than I would ask for, and I would normally go to the table and offer him more than he would ask for." *See id.* at 65:13 – 65:17. While this is certainly an enviable familial relationship, it is just as certainly a sufficient basis for concluding that the Compromise Agreement was not premised upon, or in any way indicative of, Plaintiffs' actual legal obligations.

A cynical observer might reasonably conclude that Plaintiffs were only too glad to voluntarily refund the entire alleged overvaluation regardless of their actual legal obligations. Prior to entering into the Compromise Agreement Plaintiffs had already lent hundreds of thousands of dollars to their son and Schlosser, and the business was still failing. *See* Exhibit C at page 2; Exhibit A at 32:15 – 32:24. In fact, the outstanding loans from Plaintiffs were contributing to Schlosser's slow demise because they were making Schlosser's other creditors nervous. *See* Exhibit A at 33:16 – 34:17. By entering into the Compromise Agreement, and consequently forgiving their children's debt, Plaintiffs were able, in effect, to bailout their son and daughter-in-law and to allow the family business to continue as a going concern for a little while longer. Naturally, Plaintiffs were free to do so. But they were not entitled to ask the United States to foot part of the bill. In any event, there can be little doubt that Plaintiffs were acting out of altruism, and not due to a legal obligation, as illustrated by Plaintiff Abraham Joe Osman himself during his deposition:

> Q.    [I]f your attorney had told you, you know, "look, now that we look back, the company was overvalued, but it's too late.  Your son can't do anything.  He doesn't have any claim against you, so just keep the money."  Would you have kept the money or would you have restructured deal, just like you did?
>
> A.    No, I would have restructured deal.
>
> Q.    It wouldn't have made any difference?
>
> A.    No, no.

Exhibit B at 84:11 – 84:20.  While this sentiment is admirable, it is also insufficient to meet Plaintiffs' burden.  "In short, for tax purposes, it is that which [Plaintiffs' son and daughter-in-law] could have compelled, not that in which the [Plaintiffs] were willing to acquiesce, which controls."  *Crellin's Estate v. Comm'r*, 203 F.2d 812, 815 (9th Cir. 1953).  And, under this standard, Plaintiffs' claims must fail.

Element 6:  Plaintiffs cannot demonstrate that they are entitled to the $65,421 refund claimed in the Complaint.

Even if Plaintiffs could satisfy their burden of showing that they are entitled to favorable treatment under Section 1341, they have not properly calculated the correct refund.  As discussed above, when Plaintiffs transferred Schlosser to their children, the majority of the business's shares were given as a gift – Plaintiffs' son and daughter-in-law only actually paid for roughly one-quarter of the business.  Nevertheless, in the Compromise Agreement Plaintiffs agreed to refund the entire amount of the alleged overvaluation.  *See* Exhibit C.  In essence, Plaintiffs' claim that they are entitled to a refund of $65,421 is based on the premise that Plaintiffs were legally obligated to refund the entire <u>overvaluation</u> rather than the actual <u>overpayment</u>.  This position is untenable because, since Plaintiffs' son and daughter-in-law only paid for roughly one-quarter of

8

the business, they could not possibly have been entitled to a refund of any more than one-quarter of the overvaluation.  Thus, even assuming that all their other arguments are correct, Plaintiffs' claim for a refund of $65,421 must be quartered, and Plaintiffs have not satisfied their burden proving the correct amount of the tax owed.

## CONCLUSION

WHEREFORE the United States respectfully requests that the Court grant the instant motion and dismiss Plaintiffs' claims in their entirety with prejudice.

Respectfully submitted this 7th day of September.

TROY A. EID
United States Attorney

s/ Michael G. Pitman
RICKEY WATSON
MICHAEL G. PITMAN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 305-7938

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

- - -

ABRAHAM J. OSMAN &amp;            )
DOROTHY K. OSMAN,             )
                             )
          Plaintiffs,        )
                             ) Civil No. 06-cv-2318-MSK-MJW
     vs.                     )
                             )
UNITED STATES OF AMERICA,    )
                             )
          Defendant.         )
                             )
-----------------------------

DEPOSITION OF

ROBERT J. OSMAN

Denver, Colorado

July 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California  91203
(818) 551-7300

REPORTED BY:  PATRICIA VIGIL-LADNER, RPR

FILE NO.:  A105E6A

c5d79f3f-edeb-4133-8d06-e67c90566777

Page 32

1   loan, a Wells Fargo loan, I believe.   I just wanted

2   to get your take on the accountant's interpretation

3   of the situation?

4        A.    Okay.

5        Q.    It appears that this document is dated

6   February 1999?

7        A.    Uh-huh.

8        Q.    And if you look at the last paragraph on

9   page -- on the first page, which has the

10   numbers 847 at the bottom right-hand corner, that

11   last paragraph says that the accompanied financial

12   statement has been prepared assuming the company

13   will continue as a going concern.

14        A.    Uh-huh.

15        Q.    Around this time period towards the end of

16   1998 and 1999, was it possible that Schlosser would

17   not continue as a going concern?

18        A.    Sure.

19        Q.    Why is that the case?

20        A.    Profitability was low, cash flow was very,

21   very tight.   There was a couple of adjustments that

22   had been made in prior years that dramatically

23   decreased the equity of the company and that put us

24   in violation of a note with Wells Fargo.

25        Q.    And had the company not been able to

c5d79f3f-edeb-4133-8d06-e67c90566777

1   continue going -- sorry, continue as a going

2   concern, what would have happened to it?

3      A.   Well, bankruptcy, liquidation, might have

4   been resold, which ultimately is what we did.

5      Q.   In that same paragraph, the last paragraph

6   on the first page of the report, the next sentence

7   reads, "As discussed in '09, the company has failed

8   to meet certain debt covenant requirements against

9   liquidity concerns that raise substantial doubt

10   about its ability to continue as a going concern."

11      Do you remember the debt covenants that are

12   discussed in that sentence?

13      A.   With the bank?

14      Q.   I'm not sure.  I'm asking you.

15      A.   I don't.

16      Q.   Let me ask you this:  Flip a couple pages

17   in to what is page 5 of the report, which has the

18   numbers 0851 in the bottom right-hand corner.  If

19   you look at note five there at the top of the page,

20   it looks like its discussing a $300,000 note, and

21   that the company -- the paragraph following the

22   description of the note says that the company is

23   not in compliance with its loan agreement by having

24   a debt-to-net worth ratio greater than 1.5 to one,

25   and less than a million dollars in stockholders

c5d79f3f-edeb-4133-8d06-e67c90566777

Page 34

1    equity.

2          Do you know what loan this is referring to?

3    A.    That's referring to the Wells Fargo note.

4    Q.    And is that description of the company's

5    violation of the covenants of the note accurate?

6    A.    To the best of my recollection, yes.

7    Q.    And then let me ask you to flip a couple

8    more pages to page 7.  In the bottom right-hand

9    corner, the numbers are 0853.  And this is note

10   nine.

11         In the very first sentence there, says that

12   the company is currently in default of certain debt

13   covenants and the bank has demanded payment of the

14   entire loan balance.

15         Do you remember the bank demanding payment

16   of the entire loan balance?

17   A.    Yes.

18   Q.    Do you remember when that occurred?

19   A.    I don't.

20   Q.    Did Schlosser ever pay the entire loan

21   balance?

22   A.    It did.

23   Q.    When did it do that?

24   A.    I'm going to estimate that it was February

25   of the following year, 1999.

c5d79f3f-edeb-4133-8d06-e67c90566777

1   time.  And that process eventually culminated in

2   Quist's revaluation, and then sort of restructuring

3   of the 1992 deal; is that correct?

4       A.   Yes.

5       Q.   Did you and your father negotiate regarding

6   how the 1992 deal was going to be restructured or

7   was it -- did you just agree that the process would

8   operate in a certain way?

9       A.   I'm not sure I understand your question.

10      Q.   Let me restate it.  That was a horrible

11   question.  Did you and your father ever disagree

12   about how the 1992 contract should be restructured?

13      A.   No.  If I might add to that.  My dad and I

14   have a great relationship.  And I think normally my

15   dad would come to the table and offer more than I

16   would ask for, and I would normally go to the table

17   and offer him more than he would ask for.

18      Q.   That's almost exactly what he said as well.

19   I'm just trying -- excuse me, if these questions

20   are redundant, but I just want to make sure I

21   understand it.  There was never any dispute between

22   yourself and your father.  Your relationship -- let

23   me start the question again.

24          Did your relationship with your father ever

25   become adversarial with respect to how this deal

Page 66

1   should be restructured?

2        A.    No.

3        Q.    Did your father ever deny that he should

4   bear the financial burden of the restructuring

5   based on the overpayment?

6        A.    No.

7        Q.    Do you believe that your father was

8   responsible for the overpayment?

9        A.    Yes.

10       Q.    And why is that?

11       A.    Ultimately, he was the guy running the

12  company.  The buck stops at his desk, and it was

13  his responsibility to make sure what happened there

14  was, as far as accounting and finances, were

15  accurate and correct.

16       Q.    Did you ever file a lawsuit against your

17  father?

18       A.    No.

19       Q.    Did you ever consider filing a lawsuit

20  against your father?

21       A.    Not at that point, no.

22       Q.    Have you ever considered filing a lawsuit?

23       A.    No.  There was no reason to consider that.

24  You know, we sat down, we talked about it.  I think

25  he had a legal obligation, a moral obligation to do

# EXHIBIT  B

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

- - -

ABRAHAM J. OSMAN &           )
DOROTHY K. OSMAN,            )
                             )
          Plaintiffs,        )
                             ) Civil No. 06-cv-2318-MSK-MJW
       vs.                   )
                             )
UNITED STATES OF AMERICA,    )
                             )
          Defendant.         )
                             )
------------------------------

DEPOSITION OF

ABRAHAM J. OSMAN

Denver, Colorado

July 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California  91203
(818) 551-7300

REPORTED BY:  PATRICIA VIGIL-LADNER, RPR

FILE NO.:  A105E6A

1  yourself were involved in attempts to quantify that

2  overvaluation.  Once -- and that the Quist, the

3  second Quist valuation was how the overvaluation

4  was quantified; is all that fair?

5      A.  (No verbal response.)

6      Q.  Sorry.  I need a verbal response.

7      A.  Yes.

8      Q.  Okay.  Once you had that number, how did

9  you proceed?

10     A.  It was given to the accounting firm and to

11 the estate planning attorney, and they established

12 and changed the ground rules of the original

13 agreement.

14     Q.  So there was no -- once the overvaluation

15 had been discovered and quantified, you and your

16 son did not enter into an adversarial relationship?

17     A.  No, no.

18     Q.  You never entered into negotiations

19 regarding who was responsible for the overvaluation?

20     A.  No, there was no -- that part never even

21 entered into it, because we both understood that it

22 was a mistake.

23     Q.  And you never suggested that Robert was

24 responsible for the overvaluation?

25     A.  Oh, no.

1    Q.   Did you ever argue that someone other than

2  yourself was responsible for the overvaluation?

3    A.   No.

4    Q.   Do you agree that you were responsible for

5  the overvaluation?

6    A.   I was obligated to correct the figures that

7  were --

8         (Phone interruption.)

9    Q.   (By Mr. Pitman)  Why do you believe you

10  were obligated to correct the figures?

11   A.   Well, we had a contractual obligation on

12  the original agreement.  And when they revised the

13  figures, when they were incorrect I felt I had an

14  obligation to change the contract in accordance

15  with what the accountants and lawyers said.

16   Q.   But Robert never threatened you; did he?

17   A.   No, he didn't have to.

18   Q.   Do you know if he ever talked to an outside

19  lawyer --

20   A.   No.

21   Q.   Sorry, let me finish the question.

22        Do you know if Robert ever talked to an

23  outside lawyer about the implications of the

24  overvaluation?

25   A.   No, I don't.

1           EXAMINATION

2  BY MR. PITMAN:

3     Q.   Mr. Planegger asked you whether or not your

4  attorney informed you that your son had a potential

5  contract claim against you.  Do you remember any of

6  the details of what type of contract claim your

7  attorney expected your son to be able to bring?

8     A.   Well, I can't say that I remember, but it

9  was obvious there was a mistake made in the

10 contract, and that was what was presented to me.

11    Q.   If that had not been the case, if your

12 attorney had told you, you know, look, now that we

13 look back, the company was overvalued, but it's too

14 late.  Your son can't do anything.  He doesn't have

15 any claim against you, so just keep the money.

16         Would you have kept the money or would you

17 have restructured deal, just like you did?

18    A.   No, I would have restructured deal.

19    Q.   It wouldn't have made any difference?

20    A.   No, no.

21    Q.   I just have one last question.  I noticed

22 in lots of documents, there are references to Joe

23 Osman; is that you?

24    A.   That's me.

25    Q.   Okay.

# EXHIBIT  C

## COMPROMISE AGREEMENT

WHEREAS, Abraham J. Osman and Dorothy K. Osman (hereinafter "Joe and Dorothy") sold Five Hundred (500) shares of common stock in Schlosser Tool & Machinery Co. to Robert J. Osman and Carolyn Osman (hereinafter "Robert and Carolyn") on December 31, 1992.

WHEREAS, the purchase price negotiated for the sale and purchase of said shares was equal to Three Thousand Two Hundred Eighty Nine Dollars ($3,289.00) per share based on an appraisal for the Company dated September 30, 1992, attached hereto as Exhibit A.

WHEREAS, Robert and Carolyn signed a Promissory Note equal to Four Hundred Forty Seven Thousand Three Hundred Four Dollars ($447,304.00) dated December 31, 1992 to evidence the indebtedness for the unpaid balance due for the purchase of said shares based on the Three Thousand Two Hundred Eighty Nine Dollar ($3,289.00) per share purchase price. *w/P's H-3.3 Through H-3.4*

WHEREAS, it has come to the attention of the parties that various accounting and financial errors were made in preparing the financial statements for the Company which were relied upon in order to prepare the September 30, 1992 appraisal attached hereto as Exhibit A. *w/P H-4.0 Through H-4.21*

WHEREAS, the parties commissioned the preparation of an updated appraisal dated September 30, 1992 which is based upon accurate financial and accounting information, correcting the previous errors contained in the prior appraisal. The updated appraisal as corrected using accurate financial and accounting information is attached hereto as Exhibit B. *w/P H-5.6 through H-5.14*

NOW, THEREFORE, the parties agree that the accurate valuation of the Company's stock should have been Two Thousand Six Hundred Twenty Three Dollars ($2,623.00) per share and an adjustment is required and agreed to by all of the parties to correct the Three Thousand Two Hundred Eighty Nine Dollars ($3,289.00) per share valuation previously utilized.

1.   The parties agree to cancel the Promissory Note dated December 31, 1992 for Four Hundred Forty Seven Thousand Three Hundred Four Dollars ($447,304.00) made payable to Joe and Dorothy from Robert and Carolyn. *w/P H-3.3 Through H-3.4*

2.   The parties agree that the new calculation of indebtedness attached hereto as Exhibit C shall control and shall be legally binding upon the parties, stating that the correct amount of the original Promissory Note for the unpaid balance due should have been One Hundred Fourteen Thousand Three Hundred Four Dollars ($114,304.00). *?? I don't have a copy of this note*

*w/P H-5.0*

US0832

3.   The parties agree that the re-calculated Note equal to One Hundred Fourteen Thousand Three Hundred Four Dollars ($114,304.00) has been overpaid by the amount of Three Hundred Eighty Two Thousand One Hundred Fifty Five and 26/100's Dollars ($382,155.26) based upon Exhibit C attached hereto and this overpayment shall be credited against the two loans for the total amount due equal to One Hundred Seventy Thousand Dollars ($170,000.00) from Joe to Robert and Carolyn which were subsequently re-loaned to the Company per Exhibit D, the One Hundred Forty Thousand Dollar ($140,000.00) loan from Joe directly to the Company per Exhibit E, and the last two payments forgiven equal to Ten Thousand Eight Hundred Fifty Four and 06/100's Dollars ($10,854.06) per Exhibit F.   The final total indebtedness due is agreed among the parties to be Sixty One Thousand Three Hundred One and 20/100's Dollars ($61,301.20) due and owing from Joe and Dorothy and payable to Robert and Carolyn, calculated as follows:

|        | $382,155.26 | Overpayment of Principal and Interest |
|--------|-------------|----------------------------------------|
| Less   | 140,000.00  | Loaned from Joe to Schlosser           |
| Less   | 170,000.00  | Two Loans from Joe to Robert and Carolyn |
| Less   | 10,854.06   | Last Two Payments on Original Note Forgiven |

       $ 61,301.20 Remaining Balance Due from Joe and Dorothy to
                   Robert and Carolyn.

     The parties agree that the Sixty One Thousand Three Hundred One and 20/100's Dollars ($61,301.20) has been paid in full in the amounts of Forty One Thousand Dollars ($41,000.00) on or about December 31, 1999 and Twenty Thousand Three Hundred One and 20/100's Dollars ($20,301.20) on or about March 1, 2000.

     4.   The parties to this Agreement agree to release and hold each other harmless for all other events in this transaction.

     DATED this _18_ day of _April_, 2000.


                              _Abraham J. Osman_
                              Abraham J. Osman

                              _Dorothy K. Osman_
                              Dorothy K. Osman

                              _____
                              Robert J. Osman

                              _____
                              Carolyn Osman

2

w/p  H-5.1

US0833

STATE OF COLORADO   )
     CITY AND     ) ss.
COUNTY OF DENVER   )

    Subscribed and sworn to before me this __11__ day of
__4__, 2000 by Abraham J. Osman.

    Witness my hand and official seal.

[SEAL]
                                         Notary Public

My commission expires: __NOV 1 2003__

STATE OF COLORADO   )
     CITY AND     ) ss.
COUNTY OF DENVER   )

    Subscribed and sworn to before me this __11__ day of
__4__, 2000 by Dorothy K. Osman.

    Witness my hand and official seal.

[SEAL]
                                         Notary Public

My commission expires: __Nov 1 2003__

STATE OF COLORADO   )
     CITY AND     ) ss.
COUNTY OF DENVER   )

    Subscribed and sworn to before me this __18__ day of
__April__, 2000 by Robert J. Osman.

    Witness my hand and official seal.

[SEAL]
                                         Notary Public

My commission expires: __2 - 2002__

3

w/p H-5.2

US0834

STATE OF COLORADO )
    CITY AND )  ss.
COUNTY OF DENVER )

Subscribed and sworn to before me this 18 day of April , 2000 by Carolyn Osman.

Witness my hand and official seal.

[SEAL]

Notary Public

My commission expires: 2 - 2002

003AOD
03/03/00 10:15

4

w/P H-5.3

US0835