IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

CIVIL ACTION NO. 06-cv-02318-MSK-MJW

ABRAHAM J. OSMAN, and
DOROTHY K. OSMAN,

       Plaintiffs,

v.

THE UNITED STATES OF AMERICA

       Defendant.

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiffs Abraham J. Osman and Dorothy K. Osman, by their undersigned counsel, in opposition to the Defendant United States' Motion for Summary Judgment filed on September 7, 2007. Triable issues of fact exist with regard to the claims upon which the Defendant seeks summary judgment pursuant to Fed. R. Civ. P. 56.

### CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

A. Claim 1: Income Tax Refund Suit

1. Burden of proof and elements

The Plaintiffs generally agree with the Defendant's recitation of the burden of proof and the elements necessary to establish a refund claim pursuant to section 1341 of the Internal Revenue Code. While the Defendant accurately delineated the statutory elements, any

determination of the application of section 1341 should give consideration to the purpose and context of this provision. As a remedial statute, section 1341 must be interpreted broadly to effectuate Congressional goals. Smith v. Brown, 35 F.3d at 1516 (Fed. Cir. 1994); Pennzoil-Quaker Company & Subs. v. United States, 62 Fed. Cl. 689 (Ct. Fed. Cl. 2004). Therefore, any doubts regarding the plain meaning of the statute must be resolved against the government and in favor of the taxpayer. Gould v. Gould, 245 U.S. 151 (1917). Broad interpretation is also consistent with policy considerations; section 1341 is a relief provision and would encourage taxpayers to return funds they may have received inappropriately by neutralizing all negative tax impacts of the prior taxation. Pennzoil-Quaker Company & Subs., supra.

2. Elements challenged by the Defendant

a. Element 3: The Plaintiffs can demonstrate that a deduction for their repayment is allowable under a separate section of the Internal Revenue Code.

The third requirement for application of section 1341, that a deduction must be allowable for the taxable year, should be clear. This deduction must be allowed pursuant to a provision of the Internal Revenue Code other than section 1341. In this case, the partial sale of the company, consummated at the end of 1992, was a profitable transaction, and the Plaintiffs reported the income from the sale on their subsequent years' tax returns as payments were received. See transcript of Abraham J. Osman's July 18, 2007 deposition, relevant pages of which are attached as Exhibit 1, 78:12 – 78:14. The deduction for the partial repayment of the purchase price and interest would be allowed in the 2000 tax year pursuant to sections 165(c)(2) and 212 of the Internal Revenue Code as a loss (for repayment of principal) and expense (for repayment of interest) incurred in a transaction entered into for profit. In Commissioner v.

Switlik, 184 F. 2d. 299, (3rd Cir. 1950), the court allowed a deduction pursuant to the predecessor of section 165(c)(2) for payments made by the taxpayers in a subsequent year in satisfaction of their respective liabilities as transferees of a corporation. Other courts that have addressed this issue have often not set forth the code section under which a deduction would be allowed, but several courts have held that a deduction was allowable under similar repayment scenarios. McGrath & Son, Inc. v. U.S., 549 F.Supp. 491 (So. Dist. N.Y. 1982); Estate of B.F. Whitaker v. Commissioner, 259 F.2d 379 (5th Cir. 1958); In re Apsel, 96-2 USTC ¶ 50,490 (U.S. Bank Court, Dist. Oregon 1996); see also, Revenue Ruling 78-25.

  b. Element 4: The Plaintiffs can demonstrate that they did not have an unrestricted right to the income at issue in their refund claim.

Section 1341 is only available if it is established after the close of the prior taxable year (or years) that the taxpayer did not have an unrestricted right to the previously reported items of income. When evaluating this element of section 1341, courts analyze whether the taxpayer had a legal obligation to restore the amount with respect to which a deduction is claimed; the repayment cannot be voluntary. Pennzoil-Quaker, supra; Barrett v. Commissioner, 96 T.C. 713 (1991). The courts are clear, however, that a court judgment is not required to establish a legal obligation. Id. Instead, a good-faith, non-collusive settlement agreement may establish liability to return income. Id. "The source of the obligation need not be a court judgment; however, there must be a clear showing of the taxpayer's liability to repay." Cal-Form Ins. Co. v. United States, 647 F.Supp 1083 (E.D. Cal. 1986). This result "fosters the [legal policy of] peaceful settlement of disputes without litigation." Barnett, supra.

In this case, Mr. and Mrs. Osman faced an indefensible breach of contract claim when the

erroneous appraisal was discovered. In his deposition, Mr. Osman testified that he had consulted his lawyer regarding his potential liability. See Exhibit 1, 78:18 – 78:22, 82:7 – 82:13. Mr. Osman testified further that his lawyer subsequently drafted the Compromise Agreement (Defendant's Exhibit C); the agreement included a general release clause that provided that the parties agreed to release and hold each other harmless for all events resulting from this transaction. In short, this was the kind of dispute that rarely gets litigated, at least in good faith, because there was a clear showing of the Plaintiffs' liability to repay. Again, the courts are clear that a judgment is not a prerequisite to establish liability. The Compromise Agreement was a non-collusive, good faith resolution based on a second <u>independent expert appraisal</u> of the company's value, and should be respected. Mr. Osman also testified that he did not exert any influence over the appraisal and that the appraisal was conducted by an independent third party. See Exhibit 1 at 78:18 – 78:22. Accordingly, the fourth element of section 1341 is satisfied in this case.

The fact that the buyer and seller are related does not prevent the application of section 1341. While the Compromise Agreement might be subject to a higher level of scrutiny, the price per share agreed upon in the original agreement was based on an independent appraisal. The corrected price per share set forth in the Compromise Agreement was also based upon an independent, expert appraisal. Other than the fact that settlement negotiations between buyer (son) and seller (father) might have been less antagonistic, the legal result would not have been any different if the buyer had been a complete stranger. The bottom line was that Mr. and Mrs. Osman were liable for breach of contract, and a settlement of that liability was based on an independent appraisal. In <u>Van Cleave v. United States</u>, 718 F.2d 193 (6th Cir. 1983), the Sixth

Circuit Court of Appeals allowed section 1341 treatment in a situation where the taxpayer was dealing with his closely-held corporation. The taxpayer in <u>Van Cleave</u>, a corporate officer, received $332,000 in salary and bonuses in 1974. After an audit, the IRS determined that $57,500 of the taxpayer's salary was excessive and disallowed that portion as a corporate deduction. The corporation had adopted a policy in 1969 whereby corporate officers who received income that was later determined to be excessive by the IRS were required to pay back the excess amount to the corporation. The taxpayer repaid the corporation and claimed a deduction on his 1975 taxes pursuant to section 1341. The implications of self-dealing were obvious, but the court focused on the ameliorative purpose of the statute. Given the decision in <u>Van Cleave</u> and the fact that the settlement agreement was based on an independent appraisal, the "related party" aspect to the settlement should not prevent application of section 1341.

In its Motion for Summary Judgment, the government initially claims that the fourth element of section 1341 is not satisfied because the Compromise Agreement was not entered into to terminate litigation given that the Plaintiff's son and daughter-in-law never filed a lawsuit against Plaintiffs. Again, the courts are clear that a good-faith, non-collusive settlement agreement may establish liability to return income; and there is no requirement that a lawsuit be filed. For example, in <u>Van Cleave</u>, the taxpayer's corporation did not file a lawsuit against the taxpayer to recover the excess compensation, and the court made no such requirement.

The government's argument against a finding of a legal obligation to repay then focuses on the "enviable familial" relationship between the parties, and the alleged fact that the Plaintiffs simply agreed to repay the entire alleged overvaluation without ever disputing their liability. The fact that the parties trusted each other and had a "great relationship" is quite apparent from the

deposition testimony of both Plaintiff Abraham Joe Osman and his son, Robert J. Osman. See Exhibit 1, 82:20 – 83:5; and transcript of Robert J. Osman's July 18, 2007 deposition, relevant pages of which are attached as Exhibit 2, 21:1 – 21:5. Their relationship and the level of trust certainly facilitated the Compromise Agreement and prevented a contentious and antagonistic situation. At the same time, however, the relationship did not negate the legal rights and obligations asserted/recognized by each party. As stated above, Mr. Osman testified in his deposition that he had consulted his lawyer regarding his potential liability and legal obligations. See Exhibit 1, 78:18 – 78:22, 82:7 – 82:13. Mr. Osman testified further that his lawyer subsequently drafted the Compromise Agreement (Defendant's Exhibit C); the agreement included a general release clause in which the parties agreed to release and hold each other harmless for all events resulting from this transaction. See Exhibit 1 at 78:18 – 78:22. The government's argument that the Plaintiffs simply volunteered to repay the alleged overvaluation and never disputed or investigated their potential liability is not at all supported by the available evidence in this case, especially taken in the light most favorable to the Plaintiffs.

The undisputed evidence shows that an independent expert appraisal confirmed that the original sales price had been erroneously overstated. Since the sales price was based upon the original erroneous appraised value of the company, it is clear that Plaintiffs were liable for breach of contract. The government nonetheless argues that Plaintiffs should have refused to admit the mistake, and should have forced their son to sue them. We trust the government is not advocating frivolous litigation; we trust the government is not telling us that Plaintiffs should have engaged in a deceitful cover-up by stonewalling and denying any liability to their son.

Finally, the government relies on Plaintiff Abraham Joe Osman's deposition testimony

that he would have restructured the sale and repaid the undisputed overvaluation even if the Plaintiffs were not legally obligated to do so. We agree with the government that this "sentiment is admirable," and Mr. Osman made many statements in his deposition regarding his veracity and integrity. We strongly disagree, however, with the government's assertion that this pure hypothetical leads to the conclusion that the repayment was voluntary. What the Plaintiffs may have done if there was no legal obligation to repay is pure speculation and is not relevant to the analysis of whether section 1341 is applicable in this case. The relevant facts are that the Plaintiffs faced a breach of contract claim when the erroneous appraisal was discovered. They consulted with their attorney regarding their potential liability and subsequently entered into a Compromise Agreement with their son and daughter-in-law. These facts, especially taken in the light most favorable to the Plaintiffs, establish a legal obligation to repay that is sufficient to satisfy the fourth element of section 1341.

c. Element 6: The Plaintiffs can demonstrate a triable issue of fact that they are entitled to the $65,421 refund claimed in the Complaint.

The Plaintiffs owned all the stock of Schlosser Tool and Machinery when they entered into the sale agreement with their son and daughter-in-law, Robert and Carolyn Osman, on December 31, 1992. See Defendant United States of America's Motion for Summary Judgment filed September 9, 2007 (Document #23), page 2. The value of the company, $1,644,500, was established by an independent appraisal conducted by Quist Valuation, Inc. See Exhibit 1, 78:12 – 78:14. The Plaintiffs properly structured the sale as part of an overall estate plan with full utilization of their unified estate and gift tax credit. See Exhibit 1 at 78:18 – 78:22. Accordingly, the $1,644,500 purchase price was bifurcated into a gift of $1,197,196 and a sale of

$447,304. Robert and Carolyn Osman executed a ten year promissory note in the amount of $447,304; the Plaintiffs reported all income from the sale of the company on the installment method on their 1992 through 1998 federal income tax returns. See Exhibit 1, 78:12 – 78:14. Robert and Carolyn Osman deducted the interest paid on the promissory note as investment interest during the same period. See Exhibit 2, 70:5 – 70:10.

In early 1999, the company's independent auditors discovered accounting errors that predated the 1992 gift/sale of the company, and therefore, the prior independent appraisal substantially overvalued the company. See Exhibit 1, 77:22 – 78:14. In lieu of litigation, the parties agreed to obtain a new appraisal and adjust the price of the company. See Exhibit 1, 81:2 – 81:23. The new accurate appraisal showed a value of the company, as of 1992, of $1,311,500. According to the formal "Compromise Agreement" signed on April 18, 2000, the parties agreed that there had been an overpayment of $382,155.26 of principal and interest as a result of the erroneous original appraisal. See Defendant's Exhibit C.

The government argues that the reduction in the valuation of the company should have been allocated between the (approximately 73%) gift portion and (approximately 27%) the sale portion in the same percentage as the original transfer of the company. The Plaintiffs deny that such an allocation was required, and question whether it was even a legal option. The gift portion of the transaction was consummated at the end of 1992 with the expressed intent of the donors, the completed delivery to the donees, and the acceptance by the donees of the gift. The taxpayers filed gift tax returns in 1993 to report the transaction to the Internal Revenue Service, and these returns properly maximized the Plaintiffs' unified estate and gift tax credit. See copies of gift tax returns attached as Exhibit 3. While it may have been beneficial for estate tax

purposes to file amended gift tax returns and allocate some of the valuation reduction to the gift portion of the original transaction, IRS is not obligated to accept an amended gift tax return six or seven years after the original return was filed. Goldstone v. Commissioner, 65 T.C. 113 (1975). In short, the gift portion of the transaction was complete with the acceptance of a (approximately) $1,200,000 gift and the filing of gift tax returns in 1993. The entire claimed income tax refund of $65,421 was created only by the sale portion of this transaction. The gift portion had no effect on the income tax consequences of this sale. Accordingly, the parties agreed in the Compromise Agreement to allocate the entire overvaluation to the sale portion of the original transaction. Taking these facts in the light most favorable to the Plaintiffs, there is sufficient evidence to establish that such an allocation was warranted under the circumstances, and that the Plaintiffs are entitled to the full $65,421 refund claimed in the Complaint.

## CONCLUSION

For the foregoing reasons, the Plaintiffs have come forward with sufficient evidence, taken in the light most favorable to them, to establish all of the challenged elements of their refund claim, and the Defendant's Motion for Summary Judgment should be denied.

DATED: October 10, 2007

S/Ted H. Merriam
Ted H. Merriam

S/Kevin A. Planegger
Kevin A. Planegger

MERRIAM LAW FIRM, P.C.
1625 Broadway, Suite 770
Denver, CO 80202
Telephone: (303) 592-5404
Facsimile: (303) 592-5439
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been made this 10th day of September, 2007, by placing copies in the United States Mail addressed to the following:

>Michael G. Pitman
>Rickey Watson
>Trial Attorneys, Tax Division
>U.S. Department of Justice
>P.O. Box 683
>Ben Franklin Station
>Washington, D.C. 20044-0683

>Abraham and Dorothy Osman
>5815 W. Mansfield Ave., #261
>Denver, CO 80235

>S/Kevin A. Planegger
>Kevin A. Planegger