1  with any of the other loans we've discussed today?
2      A.   I can't remember that.  I have to go back
3  into my records and do some detailed checking to
4  tell you what that was, because I was surprised you
5  gave me that document with the checks on it today.
6  If that had been 1990 -- 2000, 2001, I'd have all
7  the answers.
8      Q.   Do you remember when the settlement was
9  complete?
10     A.   I would say it was in '99 to 2000.
11     Q.   Do you remember when Robert sold the
12 business?
13     A.   I think it was in 2002.
14     Q.   Do you know how much he sold the business
15 for?
16     A.   I have no idea.
17          MR. PITMAN:  Bear with me a minute.
18          (Short pause.)
19     Q.   (By Mr. Pitman)  Do you remember if once
20 the settlement was complete, whether the note
21 remaining on the 1992 sale was entirely satisfied
22 or was there principal outstanding?
23     A.   I think that I owed him money, because he
24 had overpaid.
25     Q.   Do you have any knowledge about the

**EXHIBIT**

```
 1  So Baird, Kurtz & Dobson was your outside
 2  accountant around 1990 as of that point.  When did
 3  that change or when did you hire a different
 4  accountant?
 5      A.   '96 or '97, somewhere in there.
 6      Q.   And who was that accountant?
 7      A.   EKS & H.
 8      Q.   And was EKS & H the accountant for
 9  Schlosser through the revaluation?
10      A.   Absolutely.
11      Q.   So into 1999, 2000, EKS & H was still
12  Schlosser's accountant; is that correct?
13      A.   Yes.
14      Q.   But when you -- then you had -- you were
15  receiving advice regarding the -- you personally --
16  sorry, you and your wife were receiving advice
17  about the sale in 1992 about the restructuring in
18  1999, and there was an accounting firm giving you
19  advice in conjunction with those transactions,
20  right?
21      A.   Absolutely.
22      Q.   And what was that accounting firm?
23      A.   That was as we described.  In '92, it was
24  Baird, Kurtz & Dobson.  In '99, it was EKS & H.
25      Q.   So you were essentially using the same
```

1  accounting firm that Schlosser was?
2     A.   Oh, yeah.
3     Q.   And I believe you told me that there was
4  also an attorney giving you advice with respect to
5  the sale in '92 and the revaluation in 1999?
6     A.   That was Joe Morris.
7     Q.   So for both transactions, it was the same
8  attorney?
9     A.   Yeah.
10    Q.   Is that correct?
11    A.   Yeah.
12    Q.   And so in terms of an internal employee who
13 was responsible for Schlosser's bookkeeping, as of
14 1990, it was your wife?
15    A.   Uh-huh.
16    Q.   At some point, did someone else take
17 primary responsibility for those duties?
18    A.   Well, my wife was merely handling the cash
19 and preparing that part of the business. We had an
20 accountant that was doing the major accounting
21 work, and that was the fellow that left. I can't
22 remember his name.
23    Q.   You don't remember his name and you can't
24 tell me when he was hired?
25    A.   I can't.

```
 1    Q.   And you don't remember when he left?
 2    A.   I'm guessing he was hired '88, '89.  He was
 3  with us maybe four or five years.  No, it couldn't
 4  have been that long.  Maybe '90.  I'm guessing now.
 5  I'd have to do some real -- I don't know if I could
 6  find out, really.
 7    Q.   And do you remember when he left?
 8    A.   He left shortly before Marshall Mahlum came
 9  aboard.
10    Q.   But he was the internal accountant before
11  and after the sale in 1992?
12    A.   Absolutely.
13    Q.   And when he left, he was replaced shortly
14  thereafter by Marshall?
15    A.   Right.
16    Q.   But you don't remember when that was?
17    A.   '96, '97, somewhere in there.
18    Q.   And Marshall was the internal accountant
19  through 1999?
20    A.   Oh, yeah.  He was with us through 2000.
21    Q.   Through 2000.  Okay.  Was there ever any
22  other individual internally?
23    A.   No, other than clerks.
24    Q.   Sorry?
25    A.   Just clerks in accounting.
```

74

```
 1     Q.    Okay.
 2           MR. PITMAN:  All right.  Mr. Osman, I'm
 3   done.  Those are all the questions I have for you.
 4   Unless your attorneys have questions for you,
 5   you're free to leave.
 6           MR. MERRIAM:  We have a few questions.
 7   We'll switch seats here.
 8           (Short pause.)
 9                    EXAMINATION
10   BY MR. PLANEGGER:
11     Q.     For the record, I'm Kevin Planegger,
12   representing the Plaintiffs.  Just as a preliminary
13   matter, Mr. Pitman ended his questions with just
14   kind of a summary of all the accountants and inside
15   accountants.
16           I just wanted to just kind of clarify, you
17   don't remember the exact specific dates of, you
18   know, when someone was hired or when --
19     A.   Because after the -- like I told you, I
20   turned the business over to Robert.  He had full
21   authority, and I didn't stick my two cents into
22   general operation of the business.
23     Q.   Okay.  But in terms of the '92 transaction,
24   like your advisor, the outside accountants were
25   Baird, Kurtz & Dobson?
```

1    A.    Right.

2    Q.    And then back in the '99, 2000 frame and we
3   are doing the revaluation, that was EKS & H?

4    A.    No, no, no.  EKS & H was the subsequent.

5    Q.    That's what I'm saying.

6    A.    Okay.  Right.

7    Q.    When we got into the second appraisal?

8    A.    Right.

9    Q.    And the same thing with the internal
10  accountants, we have the so-called bad accountant
11  that we still don't have the name of.  We don't
12  remember exactly when he was --

13    A.    I can't recall.

14    Q.    When he was hired or when he was let go?

15    A.    '89 or '90, he was hired, and he left in --

16    Q.    I'm just saying you're not particularly
17  clear of the dates?

18    A.    No, but I'm pretty sure Marshall Mahlum
19  came aboard '96, '97, somewhere in there.

20    Q.    Okay.  Sometime between the first and
21  second valuation, because he's the one who found
22  the errors?

23    A.    Right.

24    Q.    I'm going back to the 1999 -- excuse me,
25  1992 time period.  You're contemplating retirement

76

```
 1   and giving up the business.  Was it your intent
 2   after meeting with your lawyers and the accountants
 3   to maximize that 1.2 million dollars --
 4       A.   Yes.
 5       Q.   -- gift tax exemption?
 6       A.   Yes.
 7       Q.   In terms of the value of the company,
 8   whether it was a one million dollar company or a 20
 9   million dollar company, the intent was to maximize
10   that 1.2 million dollar exemption, and then
11   whatever additional amount the value of the company
12   was, that part would be a purchase?
13       A.   Exactly.
14       Q.   Now with respect to the amount of the
15   transaction that was the part purchase, you
16   received payments from Robert from '92 through '99,
17   that time frame?
18       A.   Right.
19       Q.   And you paid tax on those payments coming
20   in?
21       A.   Exactly.
22       Q.   I believe Mr. Pitman asked you some
23   questions about some various loans between you and
24   Ms. Schlosser that you didn't really have too much
25   recollection of.  Did any of those loans have
```

77

1  anything to do with the accounting errors in the
2  company?
3       A.   No, no.
4       Q.   When those accounting errors came to light,
5  what did that mean to you exactly in terms of the
6  value of the company?
7       A.   Well, it meant that we had an incorrect
8  contract in 1992, and that they had to revise the
9  original contract.  And in the revision, I had to
10 change the whole structure.  And it ended up with
11 my having to -- or for Robert having to pay a
12 substantial amount of income tax, and I had already
13 paid tax on that money and I expected a refund, and
14 that's what this discussion is all about.
15      Q.   So when you went -- when the second
16 appraisal was obtained, you didn't have any
17 influence on why Quist came up with a value?
18      A.   Nothing whatsoever.  They come through with
19 the valuation, and that was given to the accountants
20 and the attorneys.  And they come up with the
21 revision in the contract, and I had an obligation
22 to make a correction.
23      Q.   And going back to even the original appraisal,
24 did you have any influence -- did you have any
25 influence on that price?

1   A.   No.

2   Q.   You didn't care what that price was?

3   A.   Whatever they gave us was what we expected
4   was right.  We were paying for professional advice
5   from the appraiser, from the accountants and from
6   the attorneys.  And with the kind of money we
7   spent, we'd be stupid not to take their
8   recommendations.

9        I mean, we'd be leaving our self open for
10  problems with IRS and everybody else.  So that's
11  why we hired these people, so we'd be in accordance
12  with the law.

13  Q.   Now when that second appraisal came in for
14  reduced value of the company as of -- as of 1992,
15  how did you decide how to structure, like, the
16  compromised agreement with --

17  A.   It was done --

18  Q.   -- Robert?

19  A.   -- by the attorney.

20  Q.   Okay.  Do you remember, like, the specifics
21  of that --

22  A.   Not offhand, I don't.

23  Q.   -- transaction?

24  A.   But we gave them the appraisal, and they,
25  the accountant and the attorney sat down and they

```
 1   come up with the answers.
 2       Q.   Was there a reason why that reduction in
 3   the appraised value of the company reduced the
 4   purchase price of the sale, as opposed to the gift
 5   portion of the original transaction?
 6       A.   Well, we had structured the original one to
 7   come up with the -- at that time what was the legal
 8   amount we could give away, and beyond that what we
 9   had to charge Robert for the business, and that had
10   been established.
11            So when they revised it, they didn't think
12   we were going on their recommendations and how to
13   proceed.  And the best way was what they did.
14       Q.   So if --
15       A.   We had no input on that.  That was done by
16   the accountants and the attorney.
17       Q.   For example, if Quist in the initial
18   appraisal came up with a value of 1.1 million
19   dollars, there would not have been a sale portion
20   of the transaction?
21       A.   That's right.
22       Q.   If it was 20 million dollars, it would have
23   been a 1.2 million dollar gift?
24       A.   Exactly.
25       Q.   And 18.8 million dollar --
```

```
1       A.    Right.
2       Q.    -- sale?  So then when you found out the
3   correct value of the company, you just went back
4   and valued -- or went back and reduced the purchase
5   price, because that was the original intent of the
6   transaction?
7       A.    Exactly.
8       Q.    One exhibit -- I guess we can mark this.
9             (Exhibit 5 marked for identification.)
10            MR. PLANEGGER:  For the record, this is
11  US0832 through 835.
12      Q.    (By Mr. Planegger)  If you could take a
13  look at this exhibit.
14      A.    Looking at this document refreshes some of
15  my memory on this now.
16      Q.    Can you explain what this document is?
17      A.    This is the revised agreement on the
18  original contract.
19      Q.    Was this drawn up by your lawyer?
20      A.    Joe Morris.  Yes, Joe Morris.
21      Q.    Do you remember all the specifics of this
22  settlement with the -- specifically on page 2, that
23  there was an overpayment of $382,000?
24      A.    Yes, that I remember.
25      Q.    And that was essentially repaid or with
```

```
 1   some cancellation of loans from you to the company?
 2        A.    Right.
 3        Q.    And from you to Robert?
 4        A.    (No verbal response.)
 5        Q.    Is that a "yes"?
 6        A.    Yes.
 7        Q.    Were you advised by your lawyer that you
 8   potentially had a -- Robert and Carolyn had a
 9   potential breach of contract claim against you?
10        A.    Oh, yes, absolutely.  And I, of course,
11   felt that in view of what the situation was, that
12   we had an obligation to correct what was incorrectly
13   done in 1992.
14        Q.    Okay.
15        A.    Now, IRS came back and said, why didn't
16   your son sue you?  And my reaction to that is, IRS
17   never had to sue me for anything I ever paid them.
18   Why should my son have to sue me to correct a
19   contract?
20        Q.    Did you and your son have a good relationship
21   even through this?
22        A.    Oh, yeah, absolutely.
23        Q.    You had every reason to believe that you're
24   a man of your word and would work this out?
25        A.    I'm a man of my word on everything I do.  I
```

```
 1   don't need a written contract for stuff.  I can --
 2   if it's right, it's right; if it's wrong, it's
 3   wrong.  That's the way I conducted my business and
 4   the way I conduct my life.
 5        Q.   One couple final questions.  Just going
 6   again back to the part sale, part gift back in
 7   1992, when you came up -- when you obtained the
 8   appraisal from Quist.
 9        A.   Right.
10        Q.   If instead of transferring the company over
11   to your son, if that instead had been a sale to an
12   unrelated third party, would you have any -- would
13   you have used that appraisal to value the company
14   for any unrelated third party?
15        A.   I would use the same figures, because --
16        Q.   That's the value of the company?
17        A.   That's the value of the company.  That was
18   done with the accountant and with the appraiser.
19        Q.   And, again, you didn't have any reason to
20   question the numbers from that appraisal?
21        A.   No.  If I had any specific reasons to
22   question it, I would have never went through with
23   the contract.
24             MR. PITMAN:  Now I have a couple more
25   questions.
```

```
                        EXAMINATION
 1
 2   BY MR. PITMAN:
 3       Q.   Mr. Planegger asked you whether or not your
 4   attorney informed you that your son had a potential
 5   contract claim against you.  Do you remember any of
 6   the details of what type of contract claim your
 7   attorney expected your son to be able to bring?
 8       A.   Well, I can't say that I remember, but it
 9   was obvious there was a mistake made in the
10   contract, and that was what was presented to me.
11       Q.   If that had not been the case, if your
12   attorney had told you, you know, look, now that we
13   look back, the company was overvalued, but it's too
14   late.  Your son can't do anything.  He doesn't have
15   any claim against you, so just keep the money.
16            Would you have kept the money or would you
17   have restructured deal, just like you did?
18       A.   No, I would have restructured deal.
19       Q.   It wouldn't have made any difference?
20       A.   No, no.
21       Q.   I just have one last question.  I noticed
22   in lots of documents, there are references to Joe
23   Osman; is that you?
24       A.   That's me.
25       Q.   Okay.
```

84

1     A.    My name is Abraham Joseph Osman.

2     Q.    Mr. Osman, thank you very much for your

3 time today.

4     A.    One thing --

5          MR. MERRIAM: Do you want to put something

6 else on the record here?

7          THE WITNESS: Yes. My son and I literally

8 both paid income tax on the same money. And the

9 reason we're here is we don't think Uncle Sam is

10 entitled to collect twice on the same money, plain

11 and simple.

12          MR. PITMAN: Thank you very much.

13          (Whereupon, the deposition concluded at

14 12:31 p.m.)

```
 1                REPORTER'S CERTIFICATE
 2         I, PATRICIA VIGIL-LADNER, Registered
 3  Professional Reporter and Notary Public in and for
 4  the State of Colorado, duly commissioned to
 5  administer oaths, do hereby certify that, previous
 6  to the commencement of the examination, the witness
 7  was duly sworn by me to testify to the truth in
 8  relation to the matters in controversy between the
 9  said parties; that the said deposition was taken in
10  stenotype by me at the time and place aforesaid and
11  was thereafter reduced to printed form by use of
12  computer-assisted transcription under my
13  supervision; that the foregoing pages is a true and
14  correct transcript of my stenotype notes thereof;
15         That I am not attorney nor counsel, nor in
16  any way connected with any of the parties to said
17  action, nor otherwise interested in the outcome of
18  this action.
19         IN WITNESS WHEREOF:  I have affixed my
20  signature and seal this 27th day of July 2007.
21     My commission expires November 15, 2009.
22  _____
            PATRICIA VIGIL-LADNER, RPR
23          (303) 427-1399
24
25  Signature Not Requested
```