TROY A. EID
United States Attorney
District of Colorado
1225 Seventeenth Street
Denver, CO 80202

RICKEY WATSON
MICHAEL G. PITMAN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 305-7938

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

</div>

| | |
|---|---|
| Abraham J. Osman, & Dorothy K. Osman, | |
| Plaintiffs, | |
| v. | Civil No.  06-cv-2318-MSK-MJW |
| United States of America, | |
| Defendant. | |

<div align="center">

**DEFENDANT UNITED STATES OF AMERICA'S REPLY TO PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

</div>

Defendant the United States of America ("United States"), by and through its undersigned counsel, herby responds to Plaintiffs Abraham J. and Dorothy K. Osman's ("Plaintiffs'") Response to the United States' Motion for Summary Judgment (the "Opposition"), filed on October 10, 2007 (Doc. # 29).

### CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

**A.     Defendant is Entitled to Summary Judgment on Claim 1: Refund Suit**

  1.  <u>Burden of Proof and Elements</u>

Plaintiffs have conceded that they bear the burden of proving that the taxes

assessed were incorrect, as well as the burden of proving the correct amount of tax

owed.  *See* Opposition at 1.

  2.  <u>Elements that Cannot be Proven by Plaintiffs</u>

<u>Element 3</u>:  Plaintiffs cannot demonstrate that a deduction is allowable.

In the United States' Motion for Summary Judgment (the "Motion"), the United

States established: (1) that Plaintiffs must show that the requested refund is justified by

a section of the Internal Revenue Code other than 26 U.S.C. § 1341; and (2) that Plaintiffs

failed to plead any such justification.  In the Opposition, Plaintiffs concede that they

bear the burden described in the Motion,[1] and – for the first time in their opposition to

the United States' dispositive motion – claim that their requested refund is allowable

under both 26 U.S.C. §§ 165(c)(2) & 212.  *See* Opposition at 2.  However, neither of these

sections justify the relief sought.

The requested refund is not justified under 26 U.S.C. §§ 165 or 212 because

Plaintiffs' primary motive for entering into the transaction at issue – the transfer of the

---

[1] To the extent Plaintiffs' contention that "[o]ther courts that have addressed this issue have often not set forth the code section under which a deduction would be allowed," Opposition at 3, is meant to suggest that Plaintiffs are entitled to a refund under Section 1341 despite the fact that they cannot identify a separate section of the Internal Revenue Code under which their refund is allowable, that suggestion is directly contrary to established law.  *See United States v. Skelly Oil Co.*, 394 U.S. 678, 683 (1969); *Pennzoil-Quaker State Co. & Subsidiaries v. United States*, 62 Fed. Cl. 689, 699-700 (2004); *Florida Progress Corp. & Subsidiaries v. Comm'r*, 348 F.3d 954, 958-59 (11th Cir. 2003).

family business, Schlosser Tool & Machinery Company ("Schlosser"), to their son and

daughter-in-law – was not economic profit.

> Section 165(c)(2) allows deductions for "losses incurred in any transaction entered into for profit, though not connected with a trade or business."  The courts have repeatedly interpreted the phrase "transaction entered into for profit", as it is used in § 165(c)(2), as requiring that the taxpayer's *primary* motive in entering into the transaction be to make a profit.

*Friedman v. Comm'r*, 869 F.2d 785, 789-90 (4th Cir. 1989); *Miller v. Comm'r*, 836 F.2d 1274,

1280 (10th Cir. 1988) ("[T]he meaning of 'transaction entered into for profit' has been

settled at least since 1938, when the Supreme Court indicated that a subjective standard

is applied and the taxpayer's primary motive must be one of profit.").  Similarly,

taxpayers may only seek deductions under Section 212 with respect to activities they

engage in with the primary purpose of making a profit. *See Cannon v. Comm'r*, 949 F.2d

345, 348-51 (10th Cir. 1991); *Zell v. Comm'r*, 763 F.2d 1139, 1142 n.2 (10th Cir. 1985) ("To

be deductible under [Section 212], the expenses must meet all of the other requirements

of § 162, including the requirement of a profit motivation.").  Plaintiffs bear the burden

of proving the necessary profit motive.  *See Cannon*, 949 F.2d at 350.

Here, Plaintiffs cannot meet their burden because the undisputed facts clearly

demonstrate that they were primarily motivated to enter into the transaction at issue by

the desire to give the family business to their son and daughter-in-law as a gift.  This

motivation was best described by Plaintiff Abraham Joe Osman himself during his

deposition when he testified that he and his wife would have given the entire business

to their son and daughter-in-law as a gift, if possible.  *See* transcript of Abraham J.

Osman's July 18, 2007 deposition, relevant excerpts of which are attached as Exhibit D,

at 26:23 – 27:4.  By contrast, had Plaintiffs been motivated primarily by profit, they would have sold the entire business for cash.  *See id.* at 27:5 – 27:12.  In short, although the transaction at issue involved a business, it was not a "business transaction." Plaintiffs were motivated by a desire to pass the family business on to their son and daughter in law for the lowest possible price, not by a desire to profit.  As such, losses associated with the transaction are not deductible under Section 165(c)(2) or Section 212. *See, e.g., Griffiths v. United States*, 54 Fed. Cl. 198, 203-04 (2002) (denying taxpayer a business expense deduction under 26 U.S.C. § 162 because the personal purpose served by payments at issue was more substantial than any business purpose).[2]  Thus, no material facts are disputed with respect to Element 3, and, under the undisputed facts, Plaintiffs have failed to carry their burden.  Accordingly, they cannot demonstrate that they are entitled to the requested refund, and the United States is entitled to judgment as a matter of law.

Element 4:  Plaintiffs cannot demonstrate that they did not have an unrestricted right to the income at issue.

In the Motion, the United States established that, under Section 1341(a)(2), Plaintiffs must demonstrate that they were legally obligated to return the funds at issue, and argued that Plaintiffs cannot satisfy this element because they repaid the funds at issue voluntarily despite the fact that they were under no legal obligation to do so.  In their Opposition, Plaintiffs argue that they were legally obligated to repay the funds at

---

[2]  None of the authorities cited by Plaintiffs in the Opposition address a situation, such as this, where the taxpayer's primary motivation is personal, rather than profit, and those authorities are consequently inapposite.

issue because their son and daughter-in-law could have brought an "indefensible breach of contract claim" against them as a result of the alleged overvaluation of Schlosser.  Opposition at 3.  Accordingly, Plaintiffs content they entered into April 18, 2000 Compromise Agreement, attached to the Motion as Exhibit C (the "Compromise Agreement"), merely to avoid the expense of a lawsuit they could not possibly have won.  But Plaintiffs offer only one piece of evidence supporting the existence of the alleged "indefensible breach of contract claim" – Mr. Osman's testimony that his attorney advised him that his son and daughter-in-law had a "potential breach of contract claim against [him]."  *See* Opposition at 4, 6; Exhibit D at 78:18 – 78:22, 82:7 – 82:13.  However, the mere fact that Mr. Osman's attorney told him that his son and daughter-in-law had a "potential" breach of contract claim against him, is not sufficient to carry Plaintiffs' burden of showing that their son and daughter-in-law had the ability to "legally compel" them to repay the entire alleged overvaluation.  *See Pennzoil-Quaker State*, 62 Fed. Cl. at 701.

Moreover, Plaintiffs' suggestion that they entered into the Compromise Agreement in order to avoid a hopeless lawsuit is belied by virtually every undisputed material fact, including the following:  Plaintiffs' son and daughter-in-law never, sued, or even considered suing, Plaintiffs, *see* transcript of Robert J. Osman's July 18, 2007 deposition, relevant excerpts of which are attached as Exhibit E, at 66:16 – 66:23; the parties never entered into any sort of adversarial relationship, *see* Exhibit D at 67:14 – 67:17; Exhibit E at 65:24 – 66:2; there were literally no negotiations regarding how the Compromise Agreement would be structured, *see* Exhibit D at 67:14 – 67:22; Exhibit E at

5

65:10 – 65:17; Plaintiffs simply agreed to repay the entire alleged overvaluation without ever disputing their liability, *see* Exhibit D at 67:23 – 68:3; Plaintiffs never warrantied that Schlosser's shares had been valued correctly, *see* December 31, 1992 Promissory Note, attached as Exhibit F; and Schlosser's accountants, Baird, Kurtz & Dobson ("BKD"), were at least partially liable for the overvaluation since it was caused by BKD accounting errors, as evidenced by the fact that BKD offered to forgive $20,000 to $25,000 worth of debt owed to it by Schlosser in exchange for a litigation release – an offer Schlosser accepted, *see* Exhibit E at 53:2 – 55:4.[3]  Thus, no material facts are disputed with respect to Element 4, and, under the undisputed facts, Plaintiffs have failed to carry their burden.  Plaintiffs cannot demonstrate that they did not have an unrestricted right to the income at issue, and the United States is entitled to judgment as a matter of law.

Element 6:  Plaintiffs cannot demonstrate that they are entitled to the $65,421 refund claimed in the Complaint.

In the Motion, the United States established that Plaintiffs bear the burden of properly quantifying the correct refund, and argued that they have not done so in this case.  In their Opposition, Plaintiffs argue that they were legally obligated to refund the

---

[3]  The fact that Plaintiffs are forced to rely on so easily distinguished an opinion as *Van Cleave v. United States*, 718 F.2d 193 (5th Cir. 1983) is evidence of the fact that the application of the "claim of right" doctrine to this case would be unprecedented.  In its opinion in *Van Cleave*, the Fifth Circuit addressed an issue that is not relevant to this case – the issue of whether a taxpayer can seek relief under Section 1341 if it becomes apparent that the taxpayer does not have a right to the funds at issue after the year of receipt.  *See id*. at 196-97.  The *Van Cleave* opinion sheds literally no light on the issue of concern here – whether Plaintiffs were legally obligated to return the funds at issue – since that issue was conceded by the government in *Van Cleave*.  *See id*. at 195 ("On appeal, however, the government does not contend that Section 1341 is inapplicable because the repayment was voluntary and indeed does not contend that the repayment in fact was voluntary.").

entire amount of the alleged overvaluation, despite the fact that their son and daughter-in-law only paid for 27% of Schlosser, because "[t]he gift portion [of the transaction] had no effect on the income tax consequences of this sale." *See* Opposition at 9. Plaintiffs are exactly wrong. The gift portion of the transaction consisted of 73% of the shares of Schlosser, while the sale portion consisted of only 27% of the shares. Yet, when it was decided that Schlosser had been overvalued by $335,804, Plaintiffs refunded 100% of the overvaluation. Plaintiffs' refund claim is premised on the conclusion that this 100% refund was proper – Plaintiffs are asking the Court to endorse their decision to make a cash refund for the overvaluation of shares which were given as a gift. Thus, the gift portion of the transaction is central to Plaintiffs' refund claim.

Plaintiffs' position would only be justified if Plaintiffs could somehow demonstrate that the 364 shares that were given as a gift were properly valued, and that the 136 shares that were sold were overvalued by $335,804 (approximately 75%). Plaintiffs have provided neither evidence, nor precedent, to support such an argument. Accordingly, Plaintiffs' position is untenable because, since Plaintiffs' son and daughter-in-law only paid for 27% the business, they could not possibly have been entitled to a refund of any more than 27% of the overvaluation. Thus, no material facts are disputed with respect to Element 6, and, under the undisputed facts, Plaintiffs have failed to carry their burden. Plaintiffs cannot demonstrate that they are entitled to the claimed refund of $65,421, and the United States is entitled to judgment as a matter of law.

## CONCLUSION

The material facts are not in dispute, and the only remaining issues are legal issues which are properly decided by the Court on summary judgment.  Through this suit, Plaintiffs have attempted to stretch the bounds of the "claim of right" doctrine beyond their breaking point.  The transaction at issue – the donation of a family business from one generation to the next, including a subsequent bailout to allow the business to continue as a going concern for a little while longer – is simply not the type of transaction anticipated by Section 1341.  This conclusion is supported by the fact that Plaintiffs have not met their burden with respect of any of the key elements of their claim.  Accordingly, the United States is entitled to judgment as a matter of law

Respectfully submitted this 9th day of November.

<div style="margin-left: 40%;">

TROY A. EID
United States Attorney

s/ Michael G. Pitman
RICKEY WATSON
MICHAEL G. PITMAN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 305-7938

</div>

# EXHIBIT  D

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

- - -

| | |
|---|---|
| ABRAHAM J. OSMAN & | ) |
| DOROTHY K. OSMAN, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) Civil No. 06-cv-2318-MSK-MJW |
|    vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

------------------------------

DEPOSITION OF

ABRAHAM J. OSMAN

Denver, Colorado

July 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California  91203
(818) 551-7300

REPORTED BY:  PATRICIA VIGIL-LADNER, RPR

FILE NO.:  A105E6A

1   Robert as a gift?

2       A.    No.

3       Q.    Why did you give the majority of the

4   business to your son and daughter in-law as a gift

5   and sell a minority of the business to them?

6       A.    Would you repeat the last part of that?

7             MR. PITMAN:  Would you mind reading it

8   back?

9             (Record read by the court reporter.)

10            THE WITNESS:  Well, first of all,

11  everything was set up by the accounting firm and

12  the attorney.  And it was through their

13  instructions as the way this whole deal was

14  structured.

15      Q.    (By Mr. Pitman)  When you say "the

16  accounting firm," are we talking about EKS --

17      A.    EKS & H.

18      Q.    And who was the attorney, if you remember?

19      A.    Joe Morris.

20      Q.    So you structured the deal the way you did

21  on their advice?

22      A.    Absolutely.

23      Q.    If it had been possible to give the entire

24  business as a gift to your son and daughter, would

25  you have done that?

1     A.   Yes, but it wasn't legally permissible,

2  because of the rules of what percentage you are

3  allowed -- what dollar amount you are allowed to

4  pass on to your heirs.

5     Q.   And if you had been transferring ownership

6  of the business to an unrelated third party, would

7  you have structured the deal differently?

8     A.   Oh, I would have sold if for cash, yes.

9     Q.   Sold it for cash?

10     A.   Yes.

11     Q.   And not given any of it as a gift?

12     A.   No.

13     Q.   When you were preparing for this

14  transaction, I understand that the structure was

15  based on the advice of the accounting firm and your

16  attorney?

17     A.   Right.

18     Q.   Did you enter into any negotiations with

19  your son?

20     A.   No.  The whole structure was done based on,

21  first, we got the valuation from Quist, and that

22  valuation was given to the accounting firm and to

23  the estate planning attorney, and they in turn

24  structured it for us.

25     Q.   So you weren't haggling with your son about

1   yourself were involved in attempts to quantify that

2   overvaluation.  Once -- and that the Quist, the

3   second Quist valuation was how the overvaluation

4   was quantified; is all that fair?

5       A.   (No verbal response.)

6       Q.   Sorry.  I need a verbal response.

7       A.   Yes.

8       Q.   Okay.  Once you had that number, how did

9   you proceed?

10      A.   It was given to the accounting firm and to

11  the estate planning attorney, and they established

12  and changed the ground rules of the original

13  agreement.

14      Q.   So there was no -- once the overvaluation

15  had been discovered and quantified, you and your

16  son did not enter into an adversarial relationship?

17      A.   No, no.

18      Q.   You never entered into negotiations

19  regarding who was responsible for the overvaluation?

20      A.   No, there was no -- that part never even

21  entered into it, because we both understood that it

22  was a mistake.

23      Q.   And you never suggested that Robert was

24  responsible for the overvaluation?

25      A.   Oh, no.

1    Q.   Did you ever argue that someone other than

2   yourself was responsible for the overvaluation?

3    A.   No.

4    Q.   Do you agree that you were responsible for

5   the overvaluation?

6    A.   I was obligated to correct the figures that

7   were --

8         (Phone interruption.)

9    Q.   (By Mr. Pitman)  Why do you believe you

10   were obligated to correct the figures?

11    A.   Well, we had a contractual obligation on

12   the original agreement.  And when they revised the

13   figures, when they were incorrect I felt I had an

14   obligation to change the contract in accordance

15   with what the accountants and lawyers said.

16    Q.   But Robert never threatened you; did he?

17    A.   No, he didn't have to.

18    Q.   Do you know if he ever talked to an outside

19   lawyer --

20    A.   No.

21    Q.   Sorry, let me finish the question.

22         Do you know if Robert ever talked to an

23   outside lawyer about the implications of the

24   overvaluation?

25    A.   No, I don't.

1   anything to do with the accounting errors in the
2   company?

3       A.    No, no.

4       Q.    When those accounting errors came to light,
5   what did that mean to you exactly in terms of the
6   value of the company?

7       A.    Well, it meant that we had an incorrect
8   contract in 1992, and that they had to revise the
9   original contract.  And in the revision, I had to
10  change the whole structure.  And it ended up with
11  my having to -- or for Robert having to pay a
12  substantial amount of income tax, and I had already
13  paid tax on that money and I expected a refund, and
14  that's what this discussion is all about.

15      Q.    So when you went -- when the second
16  appraisal was obtained, you didn't have any
17  influence on why Quist came up with a value?

18      A.    Nothing whatsoever.  They come through with
19  the valuation, and that was given to the accountants
20  and the attorneys.  And they come up with the
21  revision in the contract, and I had an obligation
22  to make a correction.

23      Q.    And going back to even the original appraisal,
24  did you have any influence -- did you have any
25  influence on that price?

1    some cancellation of loans from you to the company?

2       A.    Right.

3       Q.    And from you to Robert?

4       A.    (No verbal response.)

5       Q.    Is that a "yes"?

6       A.    Yes.

7       Q.    Were you advised by your lawyer that you

8    potentially had a -- Robert and Carolyn had a

9    potential breach of contract claim against you?

10      A.    Oh, yes, absolutely.  And I, of course,

11   felt that in view of what the situation was, that

12   we had an obligation to correct what was incorrectly

13   done in 1992.

14      Q.    Okay.

15      A.    Now, IRS came back and said, why didn't

16   your son sue you?  And my reaction to that is, IRS

17   never had to sue me for anything I ever paid them.

18   Why should my son have to sue me to correct a

19   contract?

20      Q.    Did you and your son have a good relationship

21   even through this?

22      A.    Oh, yeah, absolutely.

23      Q.    You had every reason to believe that you're

24   a man of your word and would work this out?

25      A.    I'm a man of my word on everything I do.  I

# EXHIBIT  E

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

- - -

| | | |
|---|---|---|
| ABRAHAM J. OSMAN & | ) | |
| DOROTHY K. OSMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 06-cv-2318-MSK-MJW |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

------------------------------

DEPOSITION OF

ROBERT J. OSMAN

Denver, Colorado

July 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California  91203
(818) 551-7300

REPORTED BY:  PATRICIA VIGIL-LADNER, RPR

FILE NO.:  A105E6A

1    A.    No.

2    Q.    Can you describe for me the sequence of

3 events that followed from Marshall's discovery of

4 these accounting problems?  Once he uncovered these

5 fairly significant issues, was the problem then

6 referred to any other individual or entity?

7    A.    Yes.

8    Q.    And can you describe that for me?

9    A.    We brought in the accounting firm, BKD, at

10 the time.  They spent some time, reviewed the

11 books.  They had a couple people out there for a

12 couple of weeks.

13   Q.    And what were their conclusions?

14   A.    That Marshall's work was accurate, was

15 correct, and there was a significant discrepancy in

16 the books.

17   Q.    Did they issue a written report to that

18 effect?

19   A.    I don't recall.  I would think they would

20 have had to, but I don't recall that.

21   Q.    You don't know -- strike that.

22         Did they ever explain how they had missed

23 these accounting issues that Marshall was able to

24 catch?

25   A.    No.

1    Q.   Did that surprise you at all?

2    A.   We had some considerable discussions with

3    the accounting firm.  At the time, they were not

4    doing a review.  And pardon me for the lack of

5    terminology, I believe it was a compilation.  And

6    because of the level of what they were doing, they

7    claim that it would not be normally expected for

8    them to find these errors.

9         However, they did take a couple fairly

10   outstanding bills, I believe, 20 or $25,000 in

11   bills, and offer those at no charge.  We were to

12   agree that we weren't going to sue.

13   Q.   So they were concerned that they may

14   actually be exposed to liability for missing these

15   issues?

16   A.   Yes, I believe that's correct.  Of course,

17   in the conversations with them were otherwise, oh,

18   we had no way of knowing that, but...

19   Q.   Do you remember the value of the bills that

20   they forgave in exchange for a relief in liability?

21   A.   I believe it was around 20,000.  Maybe as

22   much as 25,000.

23   Q.   And do you remember the name of an

24   individual that you were dealing with from them?

25   A.   First name was Craig.  I apologize, I can't

1    remember his last name.

2        Q.    Did they actually get you to sign a

3    release?

4        A.    Yes.

5        Q.    Do you know where a copy of that might be?

6        A.    It would have been with Schlosser.  I might

7    have a copy at home.  I can look for that, if you'd

8    like?

9        Q.    I would certainly appreciate it if you

10   would find that.

11       A.    I doubt I have it, but I might.

12       Q.    Do you remember when they produced their

13   final report?  When I say "they," I'm referring to

14   the accounting firm?

15       A.    I'm sorry, ask the question again.

16       Q.    Do you remember the time period in which

17   they produced their final report confirming

18   Marshall's investigation?

19       A.    Sorry, I don't.

20       Q.    What was the next step then?

21       A.    The process was, Marshall found the

22   inconsistency.  We called the accounting firm.

23   They sent a couple people down, spent a few weeks

24   there.  A week or so after that, we had a meeting

25   directly with the accounting firm.

1   time.   And that process eventually culminated in

2   Quist's revaluation, and then sort of restructuring

3   of the 1992 deal; is that correct?

4        A.    Yes.

5        Q.    Did you and your father negotiate regarding

6   how the 1992 deal was going to be restructured or

7   was it -- did you just agree that the process would

8   operate in a certain way?

9        A.    I'm not sure I understand your question.

10       Q.    Let me restate it.   That was a horrible

11   question.   Did you and your father ever disagree

12   about how the 1992 contract should be restructured?

13       A.    No.   If I might add to that.   My dad and I

14   have a great relationship.   And I think normally my

15   dad would come to the table and offer more than I

16   would ask for, and I would normally go to the table

17   and offer him more than he would ask for.

18       Q.    That's almost exactly what he said as well.

19   I'm just trying -- excuse me, if these questions

20   are redundant, but I just want to make sure I

21   understand it.   There was never any dispute between

22   yourself and your father.   Your relationship -- let

23   me start the question again.

24            Did your relationship with your father ever

25   become adversarial with respect to how this deal

1   should be restructured?

2       A.   No.

3       Q.   Did your father ever deny that he should

4   bear the financial burden of the restructuring

5   based on the overpayment?

6       A.   No.

7       Q.   Do you believe that your father was

8   responsible for the overpayment?

9       A.   Yes.

10      Q.   And why is that?

11      A.   Ultimately, he was the guy running the

12  company.  The buck stops at his desk, and it was

13  his responsibility to make sure what happened there

14  was, as far as accounting and finances, were

15  accurate and correct.

16      Q.   Did you ever file a lawsuit against your

17  father?

18      A.   No.

19      Q.   Did you ever consider filing a lawsuit

20  against your father?

21      A.   Not at that point, no.

22      Q.   Have you ever considered filing a lawsuit?

23      A.   No.  There was no reason to consider that.

24  You know, we sat down, we talked about it.  I think

25  he had a legal obligation, a moral obligation to do

# EXHIBIT  F

## PROMISSORY NOTE

$447,304.00                                    December 31, 1992

    1.    <u>Promise to Pay</u>.  For value received, ROBERT J. OSMAN and CAROLYN OSMAN, ("Maker") promise to pay to the order of ABRAHAM J. OSMAN and DOROTHY K. OSMAN ("Payee"), at 301 Bryant Street, Denver, Colorado  80219 or such other place as Payee may designate in writing, the sum of Four Hundred Forty Seven Thousand Three Hundred Four and no/100's Dollars ($447,304.00), in lawful money of the United States (the "Principal"), together with interest thereon at a rate equal to eight percent (8%) per annum.  Principal and interest shall be payable in One Hundred Twenty (120) equal monthly installments, with the first installment being due and payable on January 31, 1993, and succeeding installments being due and payable on the last day of each month until December 31, 2002, when the entire remaining principal, plus all accrued but unpaid interest, shall be due and payable in full.

    2.    <u>Prepayment</u>.  This Note may be prepaid in full or in part at any time without penalty or premium.  Any such prepayment shall be applied first to accrued interest and then to reduction of the Principal.

    3.    <u>Default; Acceleration</u>.  If the Maker fails to pay the full amount of any installment due under this Note, then Payee may give written notice to Maker of Payee's intention to accelerate this Note and, if all current and past due payments under this Note are not received by Payee on or before 30 days after the giving of such notice, then this Note shall be in default; and all monies owing under this Note shall become due and payable immediately, without further notice, at the election of Payee.

4.   <u>Waiver and Costs of Collection</u>.  Except as provided in paragraph 3 of this Note, demand, presentment for payment, protest, and notice of non-payment are hereby expressly waived by Maker. If any portion of this Note is not paid as provided above, and Payee employs counsel to collect this Note, or any monies due hereunder, or to enforce this Note against Maker, then, in any such event, all reasonable attorneys' fees arising from such services, and any and all expenses, costs, and charges relating to the collection or enforcement of this Note shall be an additional liability owing hereunder by Maker to Payee, payable on demand.

5.   <u>Non-Waiver</u>.  The acceptance by Payee of any payment made hereunder after the time when it becomes due will not establish a custom or constitute a waiver by Payee of any right to enforce prompt payment hereof.  Any extension of time for payment of any sum due under this Note, or the failure to exercise any right or power under this Note, shall not in any way release or affect the liability of Maker, or any other party obligated to pay any indebtedness evidenced by this Note.

6.   <u>Security</u>.  This Note is secured pursuant to a Pledge Agreement of even date herewith (the "Pledge Agreement"), with respect to One Hundred Thirty-Six (136) shares of the common stock of SCHLOSSER TOOL AND MACHINERY COMPANY, a Colorado corporation, and reference is made to the Pledge Agreement for additional terms and provisions concerning the obligations of Maker to Payee.  If Maker defaults in the performance of any of his obligations under the Pledge Agreement, then Payee may give written notice to Maker of Payee's intention to accelerate this Note and, if such default

is not cured on or before 30 days after the giving of such notice, then this Note shall be in default, and all monies owing under this Note shall become due and payable immediately, without further notice, at the election of Payee.

7.   <u>Amendment; Governing Law</u>.   This Note may not be amended or modified except by an instrument in writing executed by Payee and Maker.   This Note shall be governed and controlled as to validity, enforcement, interpretation, construction, effect, and in all other respects by the statutes, laws, and decisions of the State of Colorado.

MAKER:

_____  12/31/92
ROBERT J. OSMAN

_____  12/31/92
CAROLYN OSMAN

003AHL
12/29/92 14:10

409.027

## PLEDGE AGREEMENT

This Pledge Agreement is executed on December 31, 1992, by and between ROBERT J. OSMAN ("Pledgor") and ABRAHAM J. OSMAN and DOROTHY K. OSMAN ("Pledgee").

### Recitals:

A.   Contemporaneously with the execution of this Pledge Agreement, Pledgor has signed and delivered to Pledgee his Promissory Note (the "Note") in the principal amount of Four Hundred Forty Seven Thousand Three Hundred Four and no/100's Dollars ($447,304.00), a copy of which is attached hereto as Exhibit 1.

B.   As security for the payment of the Note, Pledgor has agreed to pledge to Pledgee One Hundred Thirty Six (136) shares of the common stock (the "Shares") of SCHLOSSER TOOL AND MACHINERY COMPANY, a Colorado corporation (the "Corporation").

IT IS THEREFORE AGREED:

1.   Pledge.   As security for payment of the Note, Pledgor hereby grants a security interest to Pledgee in the Shares. Contemporaneously with the execution of this Pledge Agreement, Pledgor shall deliver to Pledgee the certificate(s) for the Shares, endorsed in blank or accompanied by a stock power(s) endorsed in blank.

2.   Dividends. During the term of this Pledge Agreement and so long as Pledgor is not in default in the performance of his obligations under the Note or this Pledge Agreement, all dividends payable with respect to the Shares shall be paid to Pledgor.

409.022   3 A

US0197

3.   <u>Voting Rights</u>.  During the term of this Pledge Agreement, and so long as the Pledgor is not in default in the performance of his obligations under the Note or this Pledge Agreement, the Pledgor shall have the right to vote the Shares on all corporate questions with respect to which the Shares have voting rights.  If Pledgor defaults in the performance of his obligations under the Note or this Pledge Agreement, and such default is not cured within any applicable cure period, then Pledgee shall have the right to exercise all voting rights with respect to the Shares.

4.   <u>Representations</u>.  The Pledgor warrants and represents that he is the owner of the Shares and that he has the right to pledge the Shares under the terms of this Pledge Agreement.

5.   <u>Adjustments</u>.  In the event that, during the term of this Pledge Agreement, any share dividend, reclassification, readjustment, or other change is declared or made in the capital structure of the Corporation, all new, substituted, and additional shares, or other securities, issued with respect to the Shares by reason of any such change shall be held by the Pledgee under the terms of this agreement in the same manner as the Shares originally pledged hereunder.

6.   <u>Payment of Note</u>.  Upon payment in full of the Note, the Pledgee shall redeliver to the Pledgor the certificate(s) for the Shares and the stock power(s), if any, delivered to Pledgee herewith; and this Pledge Agreement and all rights of Pledgee in the Shares shall terminate.

7.   <u>Default</u>.  In the event that the Pledgor defaults in the performance of any of the terms of this agreement, or in the

payment of the principal or interest of the Note, the Pledgee shall have the rights and remedies provided in the Uniform Commercial Code in force in the State of Colorado; and in this connection, the Pledgee may, upon thirty days' notice to the Pledgor, sent by registered or certified mail, sell all the Shares in the manner provided in the Colorado Uniform Commercial Code.   Pledgor hereby consents to a private or public sale of the Shares.   Out of the proceeds of any sale, the Pledgee may retain an amount equal to the principal and interest then due on the Note, plus the amount of the expenses of the sale, and shall pay any balance of such proceeds to the Pledgor.

IN WITNESS WHEREOF, the parties have executed this agreement on the date or dates indicated below.

12/31/92
Date

"PLEDGOR"

12/31/92

ROBERT J. OSMAN

12/31/92
Date

"PLEDGEE"

ABRAHAM J. OSMAN

12/31/92
Date

DOROTHY K. OSMAN

003AHM
12/17/92 12:57

US0199